[No. C000432. Third Dist. Aug. 18, 1989.*]

POVERTY RESISTANCE CENTER et al., Plaintiffs and Appellants,
v.
DENNIS B. HART, as Director, etc., et al., Defendants and
Respondents.

*Review granted November 16, 1989. Review dismissed and opinion ordered published July 11, 1990.

COUNSEL

Daniel L. Siegel, Eugene T. Moriguchi, Roberta Ranstrom and Jeffery Ogata for Plaintiffs and Appellants.

L. B. Elam, County Counsel, and Michele Bach, Deputy County Counsel, for Defendants and Respondents.

OPINION

BLEASE, J.—This action challenges a resolution of the Sacramento County Board of Supervisors (Board), setting the levels of aid for county recipients of general assistance. General assistance is a state-mandated program for the support of all poor or incapacitated county residents who lack other means of support. Plaintiffs are the Poverty Resistance Center and individual recipients of general assistance. Defendants are the county, the Board, the County Department of Social Welfare and its director, Dennis B. Hart (Director).

Plaintiffs appeal from the judgment entered following the sustaining of defendants' demurrer to the complaint for failure to state a cause of action. The complaint charges that the Board breached the statutory duties imposed upon it by Welfare and Institutions Code sections 17000 and 17001[1] in that the standard of aid is not supported by "adequate studies of the actual cost of maintaining a minimum standard of living in Sacramento County." We will conclude that the Board has not complied with the statutory mandate by failing to adequately consider the relevant factors of subsistence and by predicating the levels of aid on documentary evidence and studies without a rational connection to the relevant factors. We will reverse the judgment.

*Facts and Procedural Background*

The facts material to our review are contained in the complaint, the documents incorporated by it, and the documents considered on the motions of the parties for judicial notice.

On September 17, 1985, the Board, after noticed public hearings at which oral presentations were made and documentary materials were received, adopted Resolution No. 85-1424. The resolution establishes monthly cash grant levels to meet shelter, food and personal and incidental needs for families, e.g., two persons $320 (including a $30 transportation allowance), persons living alone $206, and persons living in shared housing $159. It also provides a transportation allowance, $15 for employable persons and $10 for unemployable persons.

The resolution contains various recitals and findings explaining and justifying the grant levels. Among the findings is the following assertion. "Strict application of the cost-of-living survey results is not appropriate. Cost-of-living surveys, including that [*sic*] considered by this Board, represent hypothetical rather than real data pertaining to actual costs incurred by General Assistance recipients. As such, cost-of-living surveys constitute only one factor of many which must be considered in determining the adequacy of General Assistance grant levels."

Among the recitals in the resolution is a list of documents that the Board considered and reviewed in conjunction with the hearings. Chief among these documents is a memorandum from the Director recommending the maximum grant levels that were adopted by the resolution and explaining the justification for the recommendation. The Director's memorandum as-

---

[1] References to sections are to the Welfare and Institutions Code unless otherwise indicated.

serts that "The General Assistance grant is intended to meet the basic needs of shelter, food, personal needs and transportation for indigents who are residents of Sacramento County." It indicates that the amount of the proposed grant level attributable to meeting these respective needs are as follows, food $60, personal needs $9, transportation $15 for employable recipients and $10 for unemployable recipients, and the remainder for shelter costs. The grant level recommendation is asserted to be supported by cost-of-living survey results contained in several appendices.

In the appendices there is a "market basket survey" pricing costs of food, toiletries, aspirin, and cleaning supplies. The cost of food to meet the dietary standard prescribed is $60.45. The cost of the other items in the market basket survey is $7.56. There also is a breakout of public transit services that can be purchased with the recommended allocation of money for transportation. Lastly there is a survey of housing costs. The housing cost survey indicates that the average cost of shelter when the rent includes utilities is $152.67 for general assistance recipients living alone and $97.48 if sharing housing. It indicates that the average cost of shelter when the rent does not include utilities is $146.49 for general assistance recipients living alone and $110.90 if sharing housing.

Plaintiffs' counsel submitted a memorandum to the Board replying to the memorandum of the Director. It recommends higher maximum monthly grant levels and contains arguments criticizing the methodology of the Director's cost-of-living surveys and the Director's reasoning from that data to the recommended grant levels. Appended to this memorandum is a recommendation and justification for the higher grant levels prepared by a retained consultant which includes an alternative market basket survey for food items.

The Director submitted a memorandum in which he responded to the arguments and criticism in plaintiffs' counsel's memorandum and "evidence and testimony . . . presented by various community and legal organizations" at the first hearing on the topic before the Board. The Director's reply memorandum explains, inter alia, that his methodology for the market basket survey was that developed by a consultant that had been retained by the Board in 1979. That earlier survey and explanation of methodology is included in the documents before the Board.

Plaintiffs filed a complaint for declaratory, injunctive, and monetary relief alleging in pertinent part that the grant levels set by the Board in the resolution are not supported by "adequate studies of the actual cost of maintaining a minimum standard of living in Sacramento County." The complaint sets forth specific respects in which it is claimed that the method-

ology used by the Board to survey costs and to calculate the aggregate cost of subsistence living is deficient. Defendants demurred on the ground these allegations failed to state a cause of action.

The trial court sustained the demurrer on the ground that the argument and evidence "as a matter of law, fails to provide any ground for judicial intervention by this Court." The trial court reasoned that plaintiffs "have not shown a failure by the Board of Supervisors to review evidence of the minimum subsistence needs of the indigent residents within Sacramento County. The Court will not inquire into the relative validity of the various studies conducted to determine these minimum subsistence needs."

This appeal followed the ensuing judgment dismissing the action with prejudice.

*Discussion*

I

The Scope of Judicial Review

The parties advance antithetical standards of judicial review of the Board's action. We will conclude that neither is proper for reasons derived by case law from the statutes which govern the provision of general assistance.

This appeal arises on demurrer. Ordinarily, the validity of the demurrer is measured by the complaint.[2] However, in this case the factual allegations of the complaint are supplemented by documents appended to the complaint and by the documents that were judicially noticed. These documents were considered by the Board in establishing the grant levels. The materiality of this factual grist depends upon the underlying substantive law, namely, the nature of the standards of aid and care mandated by sections 17000 and 17001. (See *Perry* v. *Robertson* (1988) 201 Cal.App.3d 333, 339 [247 Cal.Rptr. 74].) The standard of judicial review of the action of the Board is in turn dependent upon these substantive statutory requirements. We first turn to the views of the parties on the requisite standard.

---

[2] "In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions, or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' (*Serrano* v. *Priest* (1971) 5 Cal.3d 584, 591 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187].) Further we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. (*Speegle* v. *Board of Fire Underwriters* (1946) 29 Cal.2d 34, 42 [172 P.2d 867].)" (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

Plaintiffs suggest that they are entitled to an independent adjudication of the cost of subsistence in Sacramento County based on evidence they would adduce in the judicial forum. Defendants suggest that judicial review is strictly limited to that ordinarily applicable to a legislative appropriation, that the only issue is whether the Board acted arbitrarily and capriciously in adopting the standards of aid. They reason that the adoption of standards of aid and care by the Board under section 17001 is a part of the budgetary process; that adoption of the budget is a legislative function; that we must broadly defer to the expertise of the Board in performing its legislative function. Neither plaintiffs' nor defendants' view is correct. Plaintiffs have too broad a view of the scope of judicial review; defendants' view is too narrow.

Plaintiffs mistake the essential posture of the adjudication. The issuable facts in the judicial proceeding are not the costs of a subsistence living in Sacramento County. Rather, as we later show, they are the facts considered by the Board in setting the grant levels. That is so because it is the lawfulness of the Board's action in setting the standard of aid which is under review. ■ "A court will uphold the agency action unless the action is arbitrary, capricious, or lacking in evidentiary support. [However, a] court must ensure that an agency has adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute." (*California Hotel and Motel Assn.* v. *Industrial Welfare Com.* (1979) 25 Cal.3d 200, 212 [157 Cal.Rptr. 840, 599 P.2d 31], fn. omitted; see also *California Assn. of Nursing Homes etc., Inc.* v. *Williams* (1970) 4 Cal.App.3d 800, 815-816 [84 Cal.Rptr. 590].) The relevant factors must be derived from the statutes which govern the agency action.

■ Hence, the factual inquiry is limited by the facts considered by the Board. With these facts in mind, we must determine (a) whether the Board considered the factors of subsistence mandated by section 17000, in adopting the standards pursuant to the mandate of section 17001, and (b) whether there is an evidentiary predicate for their action in setting the grant levels. Absent allegations of impropriety in the conduct of the Board proceedings, or in the provision of information to the Board, judicial review is limited to the record of the proceedings before the Board. (See *California Hotel and Motel Assn., supra,* 25 Cal.3d at p. 212; *Rivera* v. *Division of Industrial Welfare* (1968) 265 Cal.App.2d 576, 590-594 [71 Cal.Rptr. 739].)

Plaintiffs' only citation of authority for the contrary proposition is *Boehm* v. *Superior Court* (1986) 178 Cal.App.3d 494, 502-503 [223 Cal.Rptr. 716] [hereafter *Boehm II*] which adverts to a triable issue of fact regarding the adequacy of the housing survey conducted in that case. However, the

*Boehm II* opinion is entirely opaque concerning the context and nature of the dispute and accepts without examination or analysis the assumption that the matter was one of triable fact. It is not authority on the point for which it is cited since it fails to consider or decide the point. (See, e.g., *In re Tartar* (1959) 52 Cal.2d 250, 258 [339 P.2d 553]; *People* v. *Toro* (1989) 47 Cal.3d 966, 978, fn. 7 [254 Cal.Rptr. 811, 766 P.2d 577].)

Defendants err in the opposite direction, suggesting that there is no review at all of the factual underpinnings of the Board's action. They incorrectly view the adoption of standards of aid and care as a part of the county's budgetary process. From this they imply that the factual predicate for the Board's action is as judicially impenetrable as the ordinary exercise of the legislative authority to appropriate money. (Cf. *City of Sacramento* v. *California State Legislature* (1986) 187 Cal.App.3d 393 [231 Cal.Rptr. 686]; cf. *Green* v. *Obledo* (1984) 161 Cal.App.3d 678, 683-685 [207 Cal.Rptr. 830].) That is not the case.

While the act of adopting general assistance standards has budgetary consequences, that fact does not make the enactment a part of the budget process. (See *Mooney* v. *Pickett* (1971) 4 Cal.3d 669, 680 [94 Cal.Rptr. 279, 483 P.2d 1231]; cf. *California Welfare Rights Organization* v. *Carleson* (1971) 4 Cal.3d 445, 455-459 [93 Cal.Rptr. 758, 482 P.2d 670].) As we have said, it is a part of the administration of general assistance relief under state law. In that capacity, as a last resort, the county is subject to the judicial remedy of contempt to compel compliance with its statutory obligations despite a claim that "no county funds are available." (See *Ross* v. *Superior Court* (1977) 19 Cal.3d 899, 903 [141 Cal.Rptr. 133, 569 P.2d 727].) "[T]he excuse that [the county] cannot afford [to meet its obligation to provide general assistance] is unavailing . . . ." (*City and County of San Francisco* v. *Superior Court* (1976) 57 Cal.App.3d 44, 47 [128 Cal.Rptr. 712].)

Nor does the defendants' general invocation of the separation of powers principle aid in fixing the appropriate scope of review. The scope of judicial review in a particular context is not measured by generalities. "The proper scope of a court's review is determined by the task before it." (*Woods* v. *Superior Court* (1981) 28 Cal.3d 668, 679 [170 Cal.Rptr. 484, 620 P.2d 1032].) The task in turn is usually determined by a statutory system which indicates the scope of both agency and judicial function.

The task before us is measured by the statutes which govern the administration of general assistance. "Section 17000 imposes a mandatory duty upon the counties to support 'all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident.' " (*Mooney* v. *Pickett, supra,*

4 Cal.3d at p. 676, fn. omitted.) In carrying out that duty section 17001 imposes a further duty to adopt "standards of aid and care." Such standards are in the nature of an administrative regulation. In administering general relief "the county acts as the agent of the state." (*Id.,* at p. 679; also see, e.g., TenBroek, *California's Dual System of Family Law: Its Origin, Development, and Present Status* (1964) 16 Stan.L.Rev. 900, 943.) In enacting "standards of aid and care" as an agency of the state a county is bound by the precept that regulations "must be consistent, not in conflict with the statute, and reasonably necessary to effectuate its purpose." (*Mooney, supra,* 4 Cal.3d at p. 679.)

Embedded in the statutory requirement that the Board adopt standards of aid and care is the requirement that those standards be sufficient to meet the county's obligations under section 17000. When the general assistance grant level standard is challenged as insufficient by comparison with other government indices of poverty, the standard must be justified by an identified factual predicate concerning the *actual* costs of subsistence within the county. (See *City of San Francisco* v. *Superior Court, supra,* 57 Cal.App.3d at pp. 50-51; *Boehm* v. *County of Merced* (1985) 163 Cal.App.3d 447, 452 [209 Cal.Rptr. 530] [hereafter *Boehm I*]; *Boehm II, supra,* 178 Cal.App.3d at p. 501.) "[To adopt standards under section 17001] a county must make a determination of facts necessary to establish subsistence standards within the county." (*Boehm I, supra,* at p. 452.) This necessarily includes the minimum subsistence needs of the county's poor, indigent and incapacitated residents to satisfy the statutory mandate that the county "relieve and support" its residents in such need. (*Ibid.*) "Minimum subsistence, at the very least, must include allocations for housing, food, utilities, clothing, transportation and medical care." (*Boehm II, supra,* at p. 501.) The action of the Board in adopting standards of aid and care must be predicated on facts concerning these actual subsistence costs.

■ When discretion is assigned under a statutory scheme to a body to establish a regulatory standard predicated on an evidentiary basis that action is a legislative function. (See, e.g., *California Hotel & Motel Assn.* v. *Industrial Welfare Comm., supra,* 25 Cal.3d at p. 211.) *California Hotel & Motel Assn., supra,* says that "a court will uphold the agency action unless the action is arbitrary, capricious, or lacking in evidentiary support". (*Id.,* at p. 212.) It makes clear that the adoption of such a regulatory standard is informed by the statutory context and that the measure of sufficiency of the evidentiary predicate is " 'something like reasonableness, rational basis, substantial evidence, or clearly erroneous . . . .' " (*Id.,* at pp. 212-213, fn. 30 [quoting from Davis, Administrative Law of the Seventies (1976) pp. 653-654]; see also *id.,* at pp. 211-213; *Rivera, supra,* 265 Cal.App.2d at p. 594.) "If terms of the [standards] turn on factual issues, the [agency] must

demonstrate reasonable support in the administrative record for the factual determinations." (*California Hotel Assn, supra,* 25 Cal.3d at p. 214.) The regulatory standard that is promulgated "must be reasonably supported by the evidence." (*Id.,* at p. 213; also see, e.g., Cal. Admin. Mandamus (Cont.Ed.Bar 1966) §§ 2.8-2.9.) This means that factual premises which underpin a standard adopted under section 17001 must be supported by evidence before the Board and by reasonable inferences drawn therefrom.

The measure of reasonableness in the drawing of inferences and in their application is informed by the statutory context. (See generally *City of Sacramento* v. *Drew* (1989) 207 Cal.App.3d 1287, 1297-1298 [255 Cal.Rptr. 704].) ■■ As related, the adopted standards of aid and care are regulations and as such, must be consistent with sections 17000 and 17001 and reasonably necessary to effectuate the purposes of these statutes. (See e.g., *Mooney* v. *Pickett, supra,* 4 Cal.3d at p. 679.) They also must be consistent with the statutory mandate that aid be administered and services be provided "promptly and humanely." (§ 10000; see *Robbins* v. *Superior Court* (1985) 38 Cal.3d 199, 208-212 [211 Cal.Rptr. 398, 695 P.2d 695].) Thus, the governing statutes and the information about actual subsistence living costs provide boundaries within which the Board may exercise discretion. If the Board has gone outside these boundaries plaintiffs are entitled to judicial relief.

These assessments, with due deference to the Board, ultimately present questions of law for the court. (See *Mooney* v. *Pickett, supra,* 4 Cal.3d at p. 681.) With these considerations in mind we turn to the allegations of inadequacy of the Board's standards of aid and care in plaintiffs' complaint. Preliminary to that inquiry we note that the defendants' misperception of the standard of review has led them to decline to join issue squarely with some of the complaint's allegations of inadequacy in the standards of aid. This consideration and the fact that the defendants have not yet answered the complaint limits our discussion to the immediate posture of the case. Nonetheless, in order to resolve the appeal in the posture presented we must discuss the actionability of the matters put in issue by the complaint. With this caveat in mind the succeeding discussion will provide guidance for the parties and the trial court on remand following reversal of the judgment of dismissal.

## II

■■ Plaintiffs allege that the amount allocated to defray the cost of shelter was supported by *none* of the studies considered by the Board. The lowest assessment of the costs of shelter for general assistance recipients presented to the Board was that of the Director, as related in our discussion

of his memorandum. From all that appears the amount of the grant attributable to shelter costs under the adopted standard is *below* the costs of shelter identified by the Director. The discrepancy ranges from $7.48 to $20.90 depending on whether the recipient shares housing and whether utilities are included in the rent. This presents an apparent failure of the adopted standard to find support in the evidence considered by the Board, warranting judicial relief.

The defendants' only particularized response to this claim is that part of the discrepancy is justified because the shelter allocation need not include an amount attributable to costs of utilities since a majority of recipients do not pay a separate charge for utilities in addition to rent. Whether recipients pay a separate charge for utilities or not, they must meet this cost as a part of the cost of shelter. While the pea may be fairly covered by one or another of the (conceptual) shells, if it is not under any shell the rules of the game have been violated.[3] Under the county's methodology recipients are allocated $90 to meet shelter costs if they share housing and $137 if they live alone. But the respective average costs of shelter including utilities are $101.41 and $150.75.

This discrepancy cannot be cured by the Board's finding that cost-of-living surveys "represent hypothetical rather than real data pertaining to actual costs incurred by General Assistance recipients." That misses the point of the required survey. It provides a measure of the actual costs of subsistence upon which the Board can base its standards. It is not a charade. Persons cannot eat hypothetical food nor live in hypothetical houses. In order to depart from the range of the only available data, however it is characterized, the Board must present a reasonable justification for the extrapolation. If this were not required the establishment of grant levels would be essentially standardless, the requirement for an empirical assessment of costs of subsistence living would be a hollow one. (See e.g., *Boehm II, supra,* 178 Cal.App.3d at p. 501.) Defendants do not suggest and we do not discern any warrant in the information provided to the Board to infer that the actual cost-of-living regarding shelter costs is less than the actual average costs reported in the Director's survey.

The dissent suggests that this and other shortcomings that we will identify are cured because the Board allocates funds in its welfare budgeting scheme to "multi-dimensional" supplemental services made available to

---

[3] We note that plaintiffs also allege that the Board failed to indicate the basis of its "omission of utility costs" from the amounts allocated for the monthly grant. However, it does not appear from the Board's resolution or the supporting documents that omission of utility costs accounts for the discrepancy between shelter costs and the grant amount attributable to shelter needs.

general assistance recipients. The Director's reply memorandum does assert that Sacramento County provides funds to community organizations. "For example, the Welfare Department & Budget allocates $58,289 to the Catholic Social Service-Camellia City Center which provides services primarily to the downtown hotel population; those services include a soup kitchen and SSI counseling. The budget also allocates the sum of $46,166 to the Galt Community Concilio and the sum of $206,587 to the Legal Center for the Elderly and Disabled." The Director's memo also asserts that $300,000 is allocated for homeless shelters (which provide shelter, food, a bus pass, and laundry services) and $4,378,810 to pay social workers whose services, in part, are utilized by general assistance recipients.

However, there is nothing that permits an inference that these services fill the identified gaps between the minimal cost-of-living survey and the grant levels adopted by the Board. There is no basis to infer that the soup kitchens are available to all general assistance recipients or adequate in scale to meet any discrepancy in food costs. Neither legal assistance nor assistance in applying for other government aid programs will meet the present subsistence needs identified in the cost-of-living survey. The homeless shelters, at best, supplant a monthly grant for some recipients, but afford nothing to those recipients who do not and cannot patronize them. As we shall explain, social services may assist in meeting certain needs, however, there is no basis to infer that they are successful in meeting any of the shortcomings we identify. A social worker may assist in locating housing, but that simply does not pay the rent.

On the record before us the amount provided for shelter and utilities needs in the standard adopted by the county is not reasonably supported by the evidence before the Board. In this regard plaintiffs' complaint and the documents before the trial court state an actionable claim for relief for improper standards of aid and care under section 17001.

### III

Plaintiffs allege the grant levels are improper because there is no allocation to defray the costs of purchase of various goods and services they deem essential to subsistence. Plaintiffs argue that the grant levels were set improperly without including an amount for purchase of clothing, use of laundry machines, barber services, telephone calls, newspapers, utensils, bedding, and nonprescription medications other than aspirin. Defendants reply that no provision in the grant amount need be made for these items because they either are not essential subsistence needs, are not needs common to all recipients, or they are provided for in some fashion other than

the cash grant. The information before the Board permitted it to decline to make provision for these need items in the grant amount.

As the items considered become distant from the core elements of subsistence (food, shelter and medical care), the Board's judgment about what kinds of goods and services ought generally to be provided to maintain subsistence is entitled to deference unless the determination is beyond the pale of reasonableness. (See, e.g., *Pitts* v. *Perluss* (1962) 58 Cal.2d 824, 834-835 [27 Cal.Rptr. 19, 377 P.2d 83].) The Board need not make provision in setting the ongoing general assistance flat grant level for every conceivable component of goods and services that might be required to maintain subsistence. Defendants correctly assert that the Board may provide for meeting recipients' needs other than by providing them with funds to purchase goods and services on the open market, e.g., it may provide subsistence medical care through a county hospital. (See, e.g., *Patten* v. *County of San Diego* (1951) 106 Cal.App.2d 467, 470 [235 P.2d 217]; *Boehm II, supra,* 178 Cal.App.3d at p. 502; § 17000, fn. 4, *post.*)

However, we cannot agree with defendants' argument that the Board need make no provision for items of need unless they are common to most recipients. The defendants rely on cases like *Dandridge* v. *Williams* (1970) 397 U.S. 471 [25 L.Ed.2d 491, 90 S.Ct. 1153] holding that states are free under the aid to families with dependent children program (AFDC) to pay aid that is insufficient to meet the assessed needs of recipients. (We note that the scope of the needs assessment in California for AFDC purposes under section 11452, subdivision (a)(5) is broader than strict subsistence.) But under the statutes which govern this case, unlike those in issue in *Dandridge, supra,* the county is not free to decline to meet assessed needs. Section 17000 requires the county to relieve and support "*all* incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident" (italics added) who meet the statute's other criteria.[4] The minimal subsistence needs of some classes of recipients are not removed from the scope of the county's obligation merely because they are not common to all recipients. If this were so the county could decline to provide medical services to the sick on the theory that more than half of the recipients are not ill.

On the other hand, the county is not constrained to make an individual needs assessment for each recipient. The county may average costs in making a needs assessment so long as that is not done *unfairly.* (See *Cooper* v.

[4]Section 17000 is as follows. "Every county and every city and county shall relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions."

*Swoap* (1974) 11 Cal.3d 856, 861-863 [115 Cal.Rptr. 1, 524 P.2d 97]; cf., *Rosado* v. *Wyman* (1970) 397 U.S. 397, 419-420 [25 L.Ed.2d 442, 459-460, 90 S.Ct. 1207].) Costs may be averaged when it is reasonable to assume that recipients are similarly situated and could obtain goods at those levels with a reasonable exertion of effort on their part.

However, it is not fair to average apples and oranges. If identifiable classes of recipients have special subsistence needs, or lack some advantage most recipients enjoy those considerations cannot be averaged out of existence. For example, if some recipients benefited from a rent subsidy not available to all it would be unfair to calculate the cost of housing by assuming that all receive the subsidy.

Nor is the county required to include an allotment in the monthly grant level for items of need not likely to recur on a monthly basis for most recipients. It may decline to provide an allotment in the monthly allowance for a sinking fund to purchase nonrecurring special needs. The gravamen of plaintiffs' complaint is the assertion of impropriety in the standards of aid and care established in the Board's resolution. That resolution only sets maximum flat grant levels. Not every claim of inadequacy of the county's general assistance program can be maintained in the course of an attack on these grant levels. The county is not constrained to address every conceivable subsistence need via the *monthly* flat grant. All that must be addressed in that grant is the monthly recurring common subsistence needs meant to be defrayed with that grant.

If there are claims of other deficiencies in the county program of general assistance in failing to provide relief required under section 17000, judicial relief must be sought under a pleading which identifies the county regulation or practice that facially or as applied occasions the alleged unlawful result. With these considerations in mind we examine the items plaintiffs claim were improperly omitted from the calculation of grant levels.

We cannot fault a determination that patent medicines are not essential. The Director noted in his reply memorandum that the county provides medical care at seven health clinics and at the University of California Medical Center. With respect to setting grant levels the Board was entitled to infer that this is adequate to meet subsistence medical needs. We see no basis to deem unreasonable a determination that use of laundry machines, barber services, telephone services, and newspapers are not essential to subsistence. Plaintiffs argue that such services would aid employable recipients in obtaining work, but that is immaterial. Clothing, bedding, and utensils need not be provided for in the grant level because the Board could reasonably infer these are items not likely to be required by most recipients

on a monthly basis.[5] For the foregoing reasons plaintiffs' allegations that the standards of aid and care in issue are improper for failing to include an allocation to defray costs of these items of need are not actionable.

## IV

■ Plaintiffs allege that the standard of aid and care in issue cannot be justified by reliance upon the survey of shelter costs conducted by the Director because that survey is "grossly inadequate" in various respects. Specifically, they allege the study is inadequate because it is premised on the assumption that recipients presently live in habitable housing, it takes no account of possible future inflation in shelter costs, and it fails to consider the need of some recipients for various deposits in order to obtain housing. None of these allegations precludes reliance upon the Director's survey by the Board.

The Director is entitled to assume that the shelter costs reported by present recipients reflect the costs of habitable housing. (See Civ. Code, §§ 3545, 3548.) Nor is the survey inadequate for failing to project inflationary increases in shelter costs. The task of the Board is to set a standard of present sufficiency. If that standard becomes significantly inadequate in the future because of increases in the cost-of-living plaintiffs' remedy is to seek appropriate redress at that time. Finally, the survey is not inadequate for failing to consider the needs of some indigents for deposits in order to obtain shelter. This need is a nonrecurring special need not common to most recipients on a monthly basis. The survey was prepared to assist the Board in setting a monthly grant level of commonly recurring subsistence needs. If there is a deficiency in the county general assistance program with respect to other matters, for reasons already given, that cannot be redressed via an attack on the standards of aid and care in issue here.

## V

Plaintiffs allege that the Board failed to indicate how the amounts provided for transportation would meet recipients' subsistence needs. The

---

[5] We note the Director asserted in his reply memorandum that clothing is "located" for needy recipients by social workers under a program entitled Brief Services. Moreover, the consultant's report in 1979 upon which the methodology of the needs survey in issue is based recommended that no clothing allowance be provided in the monthly grant, but that clothing needs be met as a nonrecurring special need. It is inferable that "location" of clothing as used in the Director's memorandum means arranging for provision of free clothing through charitable organizations, since a social worker is not needed to locate a clothing store. Plaintiffs might object that this program does not in fact function adequately to provide for general assistance recipients' clothing needs but that objection does not bear on the reasonableness of deciding not to meet clothing needs via an allotment in the monthly general assistance stipend.

Director's memorandum relates the following. "This transportation allowance provides three all day bus passes and seven round trips at peak hours for employables and three all day passes and four round trips at non-peak hours for unemployables. Additionally, the General Assistance Work Project staff can authorize extra funds for employment/training related transportation expenses and the General Assistance Bureau Chief can authorize funds for unemployable persons who require ongoing medical or unforeseen medical transportation expenses." This is an adequate justification of the transportation allowance.

■ A regulation, like a statute, is presumed valid and a challenger bears the burden of pleading and proof of invalidity. (See e.g., *Knudsen Creamery Co. v. Brock* (1951) 37 Cal.2d 485, 494 [234 P.2d 26]; *Freeman v. Contra Costa County Water Dist.* (1971) 18 Cal.App.3d 404, 408 [95 Cal.Rptr. 852].) Plaintiffs have failed to plead any basis for concluding that this amount of transportation is inadequate to meet recipients' subsistence needs. Plaintiffs complain that this is a reduction in the amount of transportation that had been available to recipients in the past. However, past allocations do not a fortiori become the measure of present subsistence needs. A board of supervisors acting under section 17001 is not constrained to select the lowest measure of need that could be legally justified as the criterion of its standards of aid and care.

## VI

■ Plaintiffs allege that the survey of food costs (supporting the $60 monthly allocation) is inadequate because it is based upon faulty assumptions. Specifically, plaintiffs allege that the methodology of the survey improperly assumes that recipients have access to a refrigerator and stove, assumes they will shop around to obtain the lowest available price despite inadequate provision for transportation, and assumes recipients can purchase items in specified quantities. The defendants, once again, proffer no particularized response to these allegations of deficiency in the methodology of the survey. The first two of plaintiffs' allegations tender a colorable claim that the survey is inadequate as a predicate for a finding that recipients' subsistence food needs can be met by an allocation in the monthly grant equivalent to the results of the Director's market basket survey. In order to serve as such a predicate the market basket survey must reasonably afford the inference that an ordinary recipient can use the portion of the grant attributable to food to satisfy the subsistence need for nutrition. As appears, on this record that inference is impermissible.

The items priced in the market basket survey include perishable items in amounts that would require refrigeration between the time of purchase and

final consumption, e.g., a quart of cottage cheese. Also included are items that would require cooking in order to be eaten, e.g., chuck blade roast. This bears out plaintiffs' allegation that the methodology of the market basket survey assumes that recipients will have access to a stove and a refrigerator. The assertion that this methodology is flawed because a significant number of recipients do not have such access was raised before the Board in the memorandum of plaintiffs' counsel. The Director replied to this assertion with the observation that only 8.86 percent of the recipient population resided in the downtown hotels or rooms that do not have cooking or kitchen facilities. That is an inadequate reply. A provision for food that does not meet the needs of 8.86 percent of the recipient population is not "relie[f] and support [of] all." Nor can these needs be disregarded under any fair averaging notion evident in the record before us. Plaintiffs' allegation that the market basket survey is deficient in this respect is sufficient to state a claim requiring that defendants answer the complaint and justify the allotment of monies for food at the survey level based upon the information before the Board or tender some other defense to this claim for relief.

Plaintiffs' allegation that the market basket survey is flawed in assuming that recipients will be able to shop around and obtain their food items at the lowest price identified in the survey also presents a colorable claim which defendants should have been required to answer. The prices in the market basket survey are the lowest nonsale price for each item obtainable in any of the six chain supermarkets surveyed. In order to purchase their food items at this price level recipients would be required to travel to a store in all six chains pricing their items and then travel back to those stores that had the lowest prices for each item for the purchases. (Recipients are given no allowance for newspapers so they could compare advertised prices nor for a telephone so they could make phone inquiries.) It is simply not reasonable to expect such a shopping effort or to infer on this record that it could be accomplished in the time and within the transportation resources available.[6]

We note that the Director did assert that "[t]he surveyed stores routinely have sales, in-store specials and coupon specials during the year which represent increased savings [from the market basket survey non-sale pricing level] to the General Assistance shopper." However, there is no information in the record which supports an inference that these admittedly "unpredict-

---

[6] When the Board originally set the food allowance employing this market basket survey methodology it included an increment of approximately 10 percent to the price level to account for the unrealistic assumption of so many shopping trips. As we have noted past actions do not necessarily set the floor for future levels of support. However, the past action here does indicate that predecessors to the Board shared our view of the reasonableness of expecting recipients to find price levels comparable to those projected with this methodology.

able" savings will generally be sufficient to offset the differential between the unrealistic pricing level of the market basket survey and a price level that might reasonably be assumed to be attainable.

Plaintiffs' remaining allegation of inadequacy in the market basket survey is that it is premised on the assumption that recipients will be able to purchase food items in the precise amounts of the monthly allocations. This does not present a facially persuasive claim. The monthly allocation of amounts of foods is not always a multiple of the amounts of the units in which such foods are sold, e.g., .94 pounds of margarine are allocated per month but margarine is sold and unit priced by the pound. Similarly, it may not be possible in any given month to purchase precisely three pounds of oranges since oranges are sold by the unit of one piece of fruit. However, the food basket diet is only an exemplar, and recipients are not strictly expected to eat precisely the quantities of each item each month allocated therein. On the record before the Board, we cannot say it is unreasonable to predicate the food budget on the implicit assumptions that there will be some carry-over of odd lots from month to month and that there is enough play in the quantities to accommodate a reasonable fit between the apparently fairly averaged costing of the monthly budget and the necessary amounts of foods. Plaintiffs' allegation of deficiency in this respect is not persuasive and tenders no claim facially warranting relief.

### Disposition

None of the other points raised by the parties warrant discussion. Defendants' assertions of the constitutional invalidity of the general assistance statutes present, if anything, a matter of affirmative defense that cannot be considered in aid of a general demurrer. The conflicting arguments about the availability and extent of retroactive relief are also premature. The trial court erred in granting the demurrer in the respects we have discussed. The judgment is reversed, and the matter is remanded to the trial court for further proceedings consistent with this opinion. Costs shall be awarded to appellants.

Sims, J., concurred.

**PUGLIA, P. J.**—I dissent.

I agree with the majority that the Board's discretion in establishing levels of aid must be exercised within the framework of the governing statute and based upon evidence of subsistence living costs (maj. opn., *ante,* p. 305); furthermore, since this is a legislative function, the resulting standards of aid and care for the indigent and dependent poor must be upheld unless the

Board's action is "arbitrary, capricious, or lacking in evidentiary support." (*California Hotel & Motel Assn.* v. *Industrial Welfare Com.* (1979) 25 Cal.3d 200, 212 [157 Cal.Rptr. 840, 599 P.2d 31].) (Maj. opn., *ante,* pp. 304-305.) Where I part company with the majority is in the conclusion derived from the application of that standard of review to this record.

The majority holds that because the amount of the cash grant allocated for commonly recurring subsistence needs such as food and shelter is less than the amounts specified in cost-of-living surveys, the standards of aid and care set by the Board are lacking in evidentiary support. (Maj. opn., *ante,* pp. 305-306.) In so concluding, the majority ignores evidence that the allocations in question are supplemented by aid-in-kind funded by the county welfare department.

The cash grant is merely one form of aid available to eligible recipients to provide an adequate subsistence level for food and shelter. The evidence before the Board establishes that those needs can be met by a combination of cash grants and other programs. The county welfare department annually allocates substantial funds to various community-based organizations to provide food and shelter to general assistance recipients. The welfare department also supports homeless shelters and funds social workers to provide services to general assistance recipients such as locating affordable housing. Had the funds committed to aid-in-kind been used instead to increase the cash grant allocations for food and shelter, the record supports the conclusion those allocations as augmented would equal the "average" costs identified in the cost-of-living surveys. However, it is beyond the legitimate scope of judicial authority in effect to reorder the Board's priorities. (Cf. *Walker* v. *County of Los Angeles* (1961) 55 Cal.2d 626, 636-637 [12 Cal.Rptr. 671, 361 P.2d 247].) Where the Board in its discretion has determined to meet the needs of general assistance recipients through a combination of cash grants and aid-in-kind, it is not within the province of the court to substitute its own judgment as to the manner in which those resources should be distributed for the relief and support of the indigent. (See *Patten* v. *County of San Diego* (1951) 106 Cal.App.2d 467, 470 [235 P.2d 217].)

The resolution of the Board setting the levels of aid was not passed in a vacuum. The Board established these grant levels after two public hearings in which extensive testimony and documentation were received from the welfare department and various welfare rights organizations including the plaintiff Poverty Resistance Center. The Board considered the welfare department's cost-of-living surveys relative to transportation, shelter, food, and other commonly recurring subsistence needs. The Board also reviewed and considered conflicting evidence submitted by various organizations in substantiation of claims the grant levels recommended by the welfare

department were inadequate. These included critiques of the welfare department's cost-of-living survey and a survey recommending increased grant levels with specific allowances for utilities, laundry, and other personal household needs. In addition, the Board considered a report by the welfare department responding to the opposing claims. This report details the supplemental services available to the county's indigent population, including homeless shelters, free medical and dental care to the medically indigent, free on-site food facilities, and clothing for needy recipients.

Only after reviewing all of this evidence did the Board adopt the welfare department's recommended grant levels. The Board found that "Strict application of the cost-of-living survey results" was "not appropriate" in view of their hypothetical nature and the "multi-dimensional" supplemental services made available to general assistance recipients. "Implementation of a . . . grant level which provides more than the absolute minimal necessities could be counter-productive since it would eliminate a recipient's incentive to become self-supporting."

Welfare and Institutions Code sections 17000 and 17001 confer upon counties broad discretion " 'to determine eligibility for, the type and amount of, and conditions to be attached to indigent relief.' " (*Mooney* v. *Pickett* (1971) 4 Cal.3d 669 at pp. 678-679 [quoting *County of L.A.* v. *Dept. of Social Welfare* (1953) 41 Cal.2d 455, 458 (260 P.2d 41)]; see *Long* v. *City and County of San Francisco* (1978) 78 Cal.App.3d 61, 68 [144 Cal.Rptr. 64].) Here the Board's discretion was informed by economic and social data as well as opinion and argument and was guided by considerations of public welfare and public policy. (See *Joint Council of Interns & Residents* v. *Board of Supervisors* (1989) 210 Cal.App.3d 1202, 1211 [258 Cal.Rptr. 762].) Legislative bodies are uniquely able to make such decisions (see *Quinchard* v. *Board of Trustees* (1896) 113 Cal. 664, 670 [45 P. 856]), and once legislative discretion is so exercised, absent special circumstances, it is not subject to judicial control and supervision. (*California Assn. of Professional Employees* v. *County of Los Angeles* (1977) 74 Cal.App.3d 38, 43 [141 Cal.Rptr. 290].)

While reasonable minds may differ as to appropriate levels of aid and care, I cannot say in light of the evidence considered that the Board acted arbitrarily, capriciously or without evidentiary support, or failed in its obligation to adopt standards sufficient to carry out the mandate to "relieve and support" the county's indigent residents (Welf. & Inst. Code, § 17000). The Board considered the relevant factors of subsistence and acted within the fixed boundaries of its statutory authority after reviewing two conflicting cost-of-living surveys, two critiques thereof, three grant level proposals and the availability of aid-in-kind and supplemental services. While the data before it were conflicting, the Board based its decision on a substantial and

presumptively reliable showing as to which there was a full public airing. Unlike the majority, I am satisfied there is a rational connection between the evidence presented and the "standards of aid and care [adopted] for the indigent and dependent poor of the county . . . ." (Welf. & Inst. Code, § 17001.) Unless and until the "standards" mandated by Welfare and Institutions Code section 17001 are legislatively defined, there is no basis for concluding the monthly assistance figures set by the Board, when considered in conjunction with the range of services available in supplemental programs, constitute an abuse of the legislative body's broad discretion. (See *Long* v. *City and County of San Francisco, supra,* 78 Cal.App.3d at p. 68.) In reaching a contrary conclusion, the majority interferes with the legislative prerogative, reducing it functionally to the mere ratification of statistical data, and portends future judicial intrusions into the legislative function unless the Board slavishly enacts the latest cost-of-living survey into law.

I would affirm the judgment of the trial court.