[No. A047712. First Dist., Div. Two. May 1, 1991.]

STEWART SCATES et al., Plaintiffs and Respondents, v.
JAMES RYDINGSWORD et al., Defendants and Appellants.

FRANKIE RANDOLPH et al., Plaintiffs and Respondents, v.
CONTRA COSTA COUNTY et al., Defendants and Appellants.

**COUNSEL**

Victor J. Westman, County Counsel, and Arthur W. Walenta, Assistant County Counsel, for Defendants and Appellants.

Ralph Murphy, Jodie Berger and Philip J. Bertenthal for Plaintiffs and Respondents.

**OPINION**

**SMITH, J.**—In the fall of 1988, Contra Costa County's Board of Supervisors (board) adopted an innovative winter relief program which served the county's homeless population by opening state National Guard armories in Richmond and Concord for overnight shelter during the ensuing winter months. Unused funding for that program was then used to help fund another such program, the Spring 1989 Shelter Program, and county emergency-assistance funds were used during both programs to operate a motel hotline program.

In these class actions brought by and on behalf of county homeless indigents, the superior court issued preliminary injunctions against reducing or terminating the spring shelter or emergency assistance programs without first conducting *"Boehm* studies"—studies of minimum subsistence needs mandated whenever counties alter grant levels under general assistance (GA) programs. (*Boehm* v. *County of Merced* (1985) 163 Cal.App.3d

447 [209 Cal.Rptr. 530]; *Boehm v. Superior Court* (1986) 178 Cal.App.3d 494 [223 Cal.Rptr. 716] (*Boehm II*).)

Defendants appeal, urging that the programs were never a part of Contra Costa County's GA program and that the court therefore abused its discretion. We agree.

## BACKGROUND

Contra Costa County (county), like other counties, provides GA grants as a means of discharging its duties under Welfare and Institutions Code sections 17000 and 17001 (hereafter sections 17000 and 17001). "GA is a program of last resort for indigent and disabled persons unable to qualify for other kinds of public benefits. GA is often the only means by which they can obtain the basic necessities. . . . The program is unique because the responsibility for funding and administering it rests entirely upon individual county governments." (*Boehm II, supra*, 178 Cal.App.3d 494, 499, citations omitted.)

■ Section 17000 mandates that counties provide aid to resident indigents and dependent poor, and section 17001 vests county boards of supervisors with broad "discretion to determine eligibility for, the type and amount of, and conditions to be attached to, indigent relief" (*Boehm II, supra*, 178 Cal.App.3d 494, 500, fn. omitted).[1] In order to determine the level of GA to be paid, counties must conduct a study of what is needed for minimum subsistence. "Minimum subsistence, at the very least, must include allocations for housing, food, utilities, clothing, transportation and medical care." (*Id.*, at p. 501.)

As will be seen, the ultimate issue on this appeal is whether the superior court usurped the board's statutory duties by declaring, in effect, that programs affecting the indigent poor but never intended to discharge section-17000 obligations were nevertheless terminable only if supported by a *Boehm* study.

### *Emergency Assistance*

---

[1] "Every county . . . shall relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions." (§ 17000.)

"The board of supervisors of each county, or the agency authorized by county charter, shall adopt standards of aid and care for the indigent and dependent poor of the county . . . ." (§ 17001.)

The county's policy on "emergency assistance" is defined in excerpts from the November 1987 version of a "Social Services Department Manual" (hereafter GA Manual), which begin: "This section contains policies and procedures relating to the issuance of County Emergency Assistance. Under certain conditions and at the Department's discretion, County funds *may* be issued for emergencies when a person does not meet the standards for General Assistance or when s/he has received all aid for the month to which s/he is entitled. Since there is no legal obligation for the County to provide Emergency Assistance to meet unusual situations, there is no basic entitlement for a person to receive these funds even though s/he meets the conditions under which they may be authorized. For this reason, there is no formal application for Emergency Assistance, nor is there a right to appeal a denial of the request." The manual goes on to stress, through criteria and examples, that emergency aid (ad hoc amounts for one month maximum) is purely discretionary and available only to persons *who lack other resources or program eligibility, including GA.*[2]

The scheme thus afforded GA as a matter of right for qualifying individuals. This included "Basic Need" grants and, for those with demonstrated needs beyond the maximum allowances, supplemental "Special Need" grants. Emergency assistance took up where GA and other programs left off. It covered short-term emergencies for persons ineligible under GA criteria and not receiving categorical state or federal aid. It was administered in a purely discretionary manner.

Emergency assistance at the time when these cases arose was implemented as part of board resolution No. 88/576, which contained standards for administering GA. Part VII of the resolution ("Additional Provisions") states in part "B": "Emergency Assistance [¶] Not withstanding the provi-

---

[2] Part II ("POLICY") begins: "A. Emergency Assistance may be requested when an individual has an emergency need, *and* no aid program (AFDC, SSI/SSP, GA) is available to meet the need."

Part II goes on under "Evidentiary Hearings": "Emergency Assistance is granted by administrative approval at the Department's discretion and is not subject to appeal. It is not appropriate to send a Notice of Action. If the individual appeals the decision on his/her request for Emergency Assistance, the appeal will be denied."

Part III ("EXAMPLES") begins:

"A. The following are examples of when *General Assistance* is available and thus Emergency Assistance should not be issued.

"1. Persons whose grant for AFDC or SSI/SSP will not be issued within the month, and they meet the GA eligibility standards.

"2. GA recipients whose utilities are being or have been shut off. This may be covered by GA Special Needs.

"3. GA applicants who appear eligible to General Assistance and are granted emergency GA pending completion of the eligibility determination process."

sions above, the County Social Service Director, or his designee, may determine in writing that an applicant not otherwise eligible to General Assistance, or further General Assistance, may be granted emergency assistance for not more than one month because of emergency circumstances which are caused by fire, accident, illness, natural disaster, unemployment, crime against the applicant, agency delay or error, [for] causes which result in formal notice of eviction, in utility shut-off, or in lack of food and there are no other resources to meet the need."[3] The language is similar to a 1976 resolution by which the board first added emergency assistance to a then-current GA standards resolution. The main difference is that, as originally enacted, the program was restricted to *GA applicants*. But the program, according to uncontradicted evidence below, was recast sometime before 1980 into the form described above—a program assisting those not eligible for GA and not receiving categorical aid. Despite the change, the program continued to be carried as part of county GA ordinances.

Evidence corroborates the evolved administrative view of emergency assistance as a discretionary supplement to, not a part of, county GA. Eventually, the program came to be used as part of efforts to relieve a growing problem of homelessness in the county.[4]

---

[3] Resolution No. 88/576, titled "Standards for Administration of the General Assistance Program," begins: "The Contra Costa County Board of Supervisors RESOLVES that: [¶] In accordance with California Welfare and Institutions Code, Section 17000 et seq., Resolution No. 79/88 and Resolution No. 79/446 and subsequent amendments thereto, the Contra Costa County Board of Supervisors hereby amends Resolution [No.] 87/493 to substitute the following provisions, ADOPTS the Report and recommendations of the County Welfare Director as its findings and ADOPTS the following standards of aid and care for the indigent and dependent poor of the County (General Assistance), effective August 1, 1988. These standards govern the General Assistance Program of Contra Costa County."

The "Emergency Assistance" provision (part VIIB) appears on the last page of the resolution, after parts describing who is eligible for GA (I), GA eligibility requirements (II), GA conditions (III), GA payments (IV), sanctions for noncompliance with GA (V) and interim GA reimbursement (VI).

[4] Director Rydingsword wrote in a June 1989 report supporting a proposed Immediate Need and Shelter Program to take the place of emergency assistance: "The Emergency Assistance Program is administered on a discretionary basis by each District office of the Department. Emergency Assistance has been and is used in a discretionary manner to attempt to meet the increasing demands of the homeless. For instance, it has been and is used to pay for motel housing for homeless persons. Emergency Assistance, however, was not designed for the purpose of meeting the demands of the homeless. It also has been and is used for assisting persons prior to the date on which they receive their initial General Assistance grant benefits. In addition, Emergency Assistance has been and is used to assist people who are beyond the scope of the General Assistance eligible population of the County; that is, it has been and is used to assist people who are not eligible for General Assistance."

*Winter Relief Program*

The board adopted the Winter Relief Program (hereafter Winter Program) in November 1988 at the urging of James Rydingsword, the director of its department of social service (DSS), funding it with a county grant of $100,000 to be matched by funds raised in the community. The program opened armories in Richmond and Concord to single adults from November 1988 through April 1989.[5] During those months, emergency assistance funds were used to operate an emergency shelter hotline on evenings and weekends and to pay for motel referrals when other shelters were full.

Both programs were made available to all, without regard for GA eligibility. The coordinator of county homeless services programs declared: "The provision of shelter in the Armories and housing through the hotline to homeless persons was made without consideration of such persons' entitlement to benefits under County General Assistance. Some . . . were not indigent persons, some were not Contra Costa County residents, and some were adequately financially supported under State or Federal aid programs. Homeless persons who were furnished shelter in the Armories and/or housing through the hotline were not screened for eligibility to General Assistance, and were not obligated to provide their own efforts and cooperation to find housing and employment, which is a requirement under County General Assistance."

*Spring 1989 Shelter Program*

In March 1989, with the armories set to close at the end of April, the board adopted the Spring 1989 Shelter Program (hereafter Spring Program). The program called for development of county-sponsored shelters in the west and east/central County plus continuation of the shelter hotline. Funding was pieced together from about $24,000 left over from a 1987-1988 winter relief program, a $12,500 community-development grant and unused

---

[5] A report prepared for a board meeting on November 8 states: "On October 18, 1988 the Board accepted a report on the County's efforts to alleviate homelessness; directed that temporary shelters be established by December 1, 1988; and authorized a $100,000 allocation for the purpose of establishing two winter shelters, $50,000 to be an advance loan and $50,000 County match for community fund raising efforts."

Minutes of the meeting state: "Supervisor McPeak referred to the request of CHART for a $100,000 loan that provides the up-front for temporary shelters. She noted that the Board's action of October 18, 1988 needs to be clarified in that it was her intent that $50,000 would be a grant from the County in advance to match what hopefully would be at least $50,000 from the community. She advised that she has received inquiries as to whether the County would be prepared to match dollar for dollar what is raised above the $50,000 and stated that she would be prepared to support this." Board action included agreement that "the $50,000 originally designated as a loan to instead be used to match funds raised by the community, thereby allocating up to $100,000 for the Winter Relief Program."

funds raised by the Community Homeless Action and Resource Team (CHART) for the Winter Program.[6]

The armories ultimately closed on May 15, two weeks later than anticipated. Nevertheless, for reasons not explained in the record, the Spring Program shelters were not in place by then. Faced with the prospect of placing all homeless in motels through the more expensive hotline program and a resulting funding drain that would leave the county unable to serve all of the homeless through the fiscal year, DSS Director Rydingsword restricted the hotline program to serve those with the most critical needs—families with children, the disabled and those discharged from hospitals.

### Litigation, Repeal and the New Program

That action prompted plaintiffs Stewart Scates and Dean Spencer to sue on behalf of themselves and other homeless indigent county residents (Scates et al. v. Rydingsword et al. (Super. Ct. Contra Costa County, 1989, No. C89-02060) (hereafter *Scates*)). Their action alleged failure of the county to fulfill its duties to the homeless under section 17000 and failure to conduct a *Boehm* study before restricting the Spring Program. On May 25, the court issued a temporary restraining order preventing the county from failing to implement the Spring Program or its equivalent pending a hearing on plaintiffs' motion for a preliminary injunction.

On June 27, 1989, the board, by resolution, amended the GA resolution (No. 88/576) by repealing emergency assistance and enacting in its place a provision for "Immediate Need and Shelter" (hereafter Immediate Need Program). The resolution and a written report and recommendations by DSS Director Rydingsword (adopted as board findings) show that the Immediate Need Program would be an integral part of GA and intended to discharge county responsibilities under section 17000. The amendment's preamble declares that, with an exception not relevant here, "Resolution No. 88/576, as amended, is the only Board resolution or order since September 13, 1988 by which this Board has adopted standards of aid and care under [sections] 17000 and 17001." Under the new program, immediate benefits are available to homeless who *apply for GA*, establish identity and an inability to secure shelter on their own, and are probably GA-eligible

---

[6] A report by the County homeless management team noted good long-term prospects for homeless relief in the coming years by a variety of private and government programs. For example, an AFDC homeless assistance program operating for the past year had significantly reduced the needs of women and children. For other homeless adults, however, the report noted that the armories had operated at a combined, 200-bed capacity for the Winter Program duration, that the hotline had averaged some 40 motel referrals per night and that the Spring Program was needed, short-term, to fill the void that the armories' closing would bring.

under modified criteria. Immediate benefits are offset against GA grants, if approved. Other conditions attach, and benefits are administered with the usual GA procedural protections of written decisions, appeals and so on. Thus, unlike emergency assistance, Immediate Need assistance is an entitlement under GA.

The immediate shelter benefit for homeless applicants consists of assignment to county-sponsored or private shelters. Alternate relief is a shelter voucher good for an amount up to the current maximum monthly housing component of GA.

The clear intent of the Immediate Need Program is to replace the former, discretionary emergency-assistance aid with a more structured, GA-program component that would be more efficient financially and, for the first time, formally open GA to the homeless.[7]

Concurrently with the amendment, the board apparently approved a recommendation to limit hotline use to information and referral services. It also declared that the Spring Program, the Winter Program and the hotline had not been GA programs but were instead adopted under Government Code section 26227.[8]

---

[7]The supporting report explains: "Under the Department's recommendations to the Board, the adoption of the Immediate Need and Shelter Program as components of General Assistance would render Emergency Assistance unnecessary, for General Assistance eligibles[,] in light of the immediate provision of benefits under Immediate Need and the three-level approach to the immediate provision of shelter benefits. Immediate Need benefits may be provided on the same day of application to those who qualify for immediate need. Moreover, the departmental discretion under Emergency Assistance will be replaced with Immediate Need and Shelter Program standards of care and aid and implementing department regulations; and the County will no longer supplement Federal or State aid programs and otherwise provide general fund assistance for persons who do not meet the County's General Assistance eligibility standards, but will better serve the General Assistance eligible population in the County."

DSS Director Rydingsword stated in a June 20 declaration: "Under the Contra Costa County General Assistance Program, to date, there has been an absence of Board-adopted General Assistance standards on homeless services for persons who may be eligible to General Assistance. The Emergency Assistance program, supported through the county's general fund, has been used in a discretionary manner to attempt to meet the increasing demands for services to the homeless population, but was not programatically designed for that purpose."

[8]"First: The Board of Supervisors declares that the Winter, 1988-89 and Spring, 1989 Homeless Shelter Programs and the Homeless Hotline Program have not been adopted by this Board as General Assistance programs under [section] 17000, et seq. [¶] Second: The Board ratifies [those programs] as programs adopted by the Board pursuant to Government Code section 26227, and as such, directs that the Spring Shelter Program and the Homeless Hotline Program continue until August 31, 1989."

Government Code section 26227 provides in part: "The board of supervisors of any county may appropriate and expend money from the general fund of the county to establish county programs or to fund other programs deemed by the board of supervisors to be necessary to meet the social needs of the population of the county, including but not limited to, the areas

*Injunction*

On October 24, the court in *Scates* granted class certification and enjoined the county from failing to maintain the Spring Program, or its equivalent, or altering it without first completing a *Boehm* study showing that shelter would be available to plaintiffs and class members. In granting the injunction, the court found it reasonably probable that plaintiffs would succeed on the merits of a claim that replacing the Spring Program with the Immediate Need Program was done without an adequate study. The court implicitly concluded that the Spring Program was discharging county duties to indigents under section 17000.

Three days later, plaintiffs in Randolph et al. v. Contra Costa County et al. (Super. Ct. Contra Costa County, 1989, No. C89-04503) (hereafter *Randolph*) filed suit, also as a class action. They sought, among other things, to enjoin terminating the emergency assistance program and certain housing-related GA "Special Need" grants, claiming that there was no adequate *Boehm* study. The court on November 17 granted class certification, issued a preliminary injunction against reducing or eliminating those benefits pending an adequate study, and granted a motion to consolidate *Scates* and *Randolph* for purposes of appeal. The injunction rested on conclusions that both the special-need grants and emergency assistance were components of county GA.

A formal consolidation order was filed on December 26, 1989. Defendants appeal (Code Civ. Proc., § 904.1, subd. (f)), challenging only those parts of the orders enjoining termination of emergency assistance and the Spring Program.

DISCUSSION

█ Trial courts evaluate two interrelated factors when deciding whether to issue a preliminary injunction. First is the likelihood that the plaintiff will prevail on the merits at trial. Second is the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the injunction were issued. The ruling does not constitute an adjudication of the ultimate rights in controversy. Generally, the ruling rests in the sound discretion of the trial court, and the exercise of that discretion will not be disturbed on appeal absent a showing that it has been abused. (*Cohen* v. *Board of Supervisors* (1985) 40 Cal.3d

of health, law enforcement, public safety, rehabilitation, welfare, education and legal services, and the needs of physically, mentally and financially handicapped persons and aged persons."

277, 286 [219 Cal.Rptr. 467, 707 P.2d 840].) Our review is limited to evidence that was presented to the trial court on the motion. (*American Academy of Pediatrics* v. *Van de Kamp* (1989) 214 Cal.App.3d 831, 838 [263 Cal.Rptr. 46].)[9]

Defendants do not contest the interim-harm factor in this case, only the assessment of likely success on the merits. ■ "[A]n injunction should not issue where there is no possibility of success even though its issuance might prevent irreparable harm. . . . Where there is indeed no likelihood that the plaintiff will prevail, an injunction favoring the plaintiff serves no valid purpose and can only *cause* needless harm." (*American Academy of Pediatrics* v. *Van de Kamp, supra*, 214 Cal.App.3d 831, 838, citation omitted and italics added.)

### Emergency Assistance as GA

■ The court in the *Scates* order was not explicit, but in the *Randolph* order it expressly found emergency assistance to be a "component[]" of county GA. We find inadequate support for that conclusion on this record.

The court was swayed by the fact that the emergency assistance provision is part of a resolution dealing generally with GA standards, as indicated by the resolution's preamble and other provisions. (See fn. 3, *ante*.) Also, as plaintiffs point out, one might infer GA inclusion from the fact that the provision speaks of aid for "an applicant not *otherwise* eligible to General Assistance . . . ." (Italics added.)

However, that construction takes bits of the record out of context and ignores uncontradicted evidence that the county had always treated emergency assistance as discretionary and supplemental to GA, not as a part of GA itself. The fact that the provision appears in a GA-standards resolution would be significant had there been no administrative interpretation. However, that is not the case. As early as the resolution in 1976 (when plaintiffs allege the program was created), emergency assistance was placed into a current GA-standards resolution; that was a logical place to package a program which picked up where GA left off and, as first enacted, provided relief only for GA applicants. There is no evidence that it was ever placed anywhere *but* in a current GA resolution.

Meanwhile, for over 12 years apparently, emergency assistance was interpreted administratively as *outside* the scope of GA. The GA Manual

---

[9]This principle requires us to deny plaintiffs' request to take judicial notice of a November 1989 board resolution which, it appears, was not presented on the motion below.

unmistakably shows that interpretation as of 1987, before the shelter and hot line programs at issue here arose, and there is no evidence that the county or its social services department ever took a different view of the matter. The GA Manual treats emergency assistance as discretionary with the department, not subject to hearing, notice or appeal rights, not subject to the eligibility requirements or conditions for GA and not even requiring a formal application (except during some time before 1980). (See fn. 4, *ante.*) The emergency assistance provision itself strongly commands that interpretation. Despite some arguable ambiguity in the words "otherwise eligible," the provision is clear overall. Aid is available "[n]ot withstanding" [*sic*] GA criteria set out earlier in the resolution—i.e., without regard for GA eligibility. It is aid designed for emergency situations where the individual has "no other resources to meet the need"—including GA. Also, the provision appears in an "Additional Provisions" section of the resolution, separated from the GA eligibility criteria and conditions.

■ A court must accord great weight to an interpretation placed on a board enactment by the administrative agency charged with its enforcement and interpretation, especially where that interpretation is of long standing and has remained uniform. (*Anderson v. San Francisco Rent Stabilization & Arbitration Bd.* (1987) 192 Cal.App.3d 1336, 1343 [237 Cal.Rptr. 894]; *Engs Motor Truck Co. v. State Bd. of Equalization* (1987) 189 Cal.App.3d 1458, 1471 [235 Cal.Rptr. 117].) ■ The court below overlooked the long history of including emergency-assistance provisions in GA resolutions and ignored an administrative interpretation of apparent long standing. The court was right to discount *to some degree* the evidentiary worth of post-complaint statements by the board and DSS director as self-serving and after the fact. However, they had some value (cf. *Anderson v. San Francisco Rent Stabilization & Arbitration Bd., supra,* 192 Cal.App.3d at pp. 1346-1347 [assistant city attorney's account of negotiation leading to supervisors' enactment illuminated legislative intent]) and, in any event, were entirely consistent with the other evidence.

We find no substantial evidence in the record as a whole to support the finding that emergency assistance was a component of the county's GA program. The issue is basically one of intent, and there is no substantial evidence that the county, its board or its social services department ever treated emergency assistance as an integral part of GA.

*Section 17000 Aid Beyond GA*

■ The superior court apparently found, as an alternative to its GA-"component" conclusion, that emergency assistance and the Spring Program and hotline—whether or not parts of GA—were programs intended

to discharge county obligations under section 17000. The *Scates* order reasons as follows: "While counties often implement their decisions under Section 17000 by General Assistance standards, it does not follow that a county's determination as to whom should receive General Assistance ipso facto resolves the county's duty to support. If that were so, a county could insulate itself from its Section 17000 obligations by General Assistance exclusions." This was in answer to an argument by defendants that non-GA eligibles lacked standing to raise claims under section 17000.

We agree in principle with the court's assumption that a county might choose to discharge its section 17000 obligations by programs other than GA. Attempts by counties to claim discharge of section-17000 obligations through in-kind benefits or other substitutes for GA cash grants have been examined. The Supreme Court in *Robbins* v. *Superior Court* (1985) 38 Cal.3d 199 [211 Cal.Rptr. 398, 695 P.2d 695], for example, approved in concept the provision of in-kind benefits but held that a county program offering mandatory food and shelter at a poorly maintained county-run facility was likely to violate recipients' constitutional rights to privacy and to live with whom they chose. (*Id.*, at pp. 203, 210-217.) Also, while state law "does not require that the county grant indigents any specific type of relief nor . . . require the payment of any specific amount of money to indigents" (*Patten* v. *County of San Diego* (1951) 106 Cal.App.2d 467, 470 [235 P.2d 217]), in-kind programs may be subject to criticism that services like homeless shelters and soup centers, for example, do not demonstrably benefit enough indigents or relieve conditions county-wide to count as section 17000 aid. (See, e.g., *Poverty Resistance Center* v. *Hart* (1989) 213 Cal.App.3d 295, 306-307 [261 Cal.Rptr. 545]; but see dis. opn. by Puglia, J., *id.*, at p. 314.) "Persons cannot eat hypothetical food nor live in hypothetical houses." (*Id.*, maj. opn. at p. 306.) Whatever the pitfalls of providing that kind of aid, however, a county does have the option. To this extent, then, we agree with the trial court that defendants' view of GA below as *necessarily* defining the scope of section 17000 aid is too confining as an abstract proposition.

We cannot agree, however, that the county in this case has chosen to fulfill its obligations through the Spring Program or emergency assistance, or that to respect the county's intent regarding those programs would somehow allow it to, in the trial court's words, "insulate itself from its Section 17000 obligations by General Assistance exclusions."

The fear by the court that counties will evade their statutory duties is puzzling. Precisely because of the litigation risks of noncash benefits just cited, a county may be understandably reluctant to designate non-GA programs as discharging its statutory duties. Yet as the record here suggests, a

county may want to implement them for humanitarian reasons and to experiment with various flexible approaches to new problems in a search for permanent solutions. Flexibility is essential in that search. By denying section-17000 intent, a county hardly "insulates" itself from the statute. To the contrary, it makes itself *more vulnerable* to attack. In an action attacking the adequacy of its section-17000 programs, the county cannot rely on programs it disclaims—except to the extent that a *Boehm* study may show them as affecting overall subsistence needs county wide. Thus there is a strong incentive to claim that non-GA programs *do* discharge section-17000 duties and to fund and structure them accordingly.

We find insufficient support for a finding that the county in this case *intended* its emergency assistance or Spring Program or hotline to constitute section-17000 aid. Emergency-assistance funding for the hotline referrals, for example, was intended to be *discretionary only*, and we have already noted that the program was clearly not intended to be a part of GA. That evidence refutes the idea that emergency assistance was a section-17000 program. If used as such, emergency assistance would have been melded into a state-*mandated* program and thus lost its essentially discretionary character. The court below logically concluded that non-GA components of a section-17000 program would carry the same *Boehm*-study consequences as GA components. However, to construe emergency assistance as section 17000 aid is contrary to the county's strongly expressed intent.

Similar obstacles prevent treating the temporary, indiscriminate shelter aid in the Spring Program (or the Winter Program before it) as meant to discharge section-17000 duties. First, the fixed funding and fixed duration of each program make a section-17000 intent highly improbable. The record shows that the county was testing various combinations of approaches to the homeless problem, making adaptations as it tackled a pressing problem head on. The creative use of public and private funds for public and private shelter, limited county resources, evolving task force and CHART recommendations and variable scope of the homeless problem all made innovation and flexibility vital. Nothing shows that the board intended these responsive, evolving programs to be cast in concrete as enforceable entitlements. That prospect would almost certainly have deterred quick action, ironically, to the detriment of those who enjoyed and now seek to lock in those programs under section 17000.

Plaintiffs cite a statement by county counsel below that board members enacting the Spring Program "did not have a clear understanding of what they were doing. They were aiming to get a body of the people out of the streets and under shelter, completely disregarding what the right to entitlement or lack of right of entitlement to those people was." Such a statement,

which the attorney prefaced with "I think . . ." and did *not* say was based on firsthand knowledge, helps us little. However, giving it the weight which plaintiffs desire, it only bolsters what the rest of the record so strongly shows—that the program was a temporary, humanitarian response to a tough problem. It certainly does not support a finding that the board intended the program to be an entitlement.

Finally, it is hard to see how the board could have thought that a no-questions-asked, stopgap emergency shelter program with no eligibility criteria or conditions was in discharge of its duties to provide care and aid to "indigent persons . . . lawfully resident" in the county (see text of § 17000 at fn. 1, *ante,* p. 1089). Undisputed evidence shows that the lack of standards for the program resulted in some *nonresidents* and even *nonindigents* using the armories.

Janet Thompkins, program analyst for DSS, declared that some people served by the armories and the hotline were not indigent, were not county residents and were receiving adequate financial aid under state or federal programs. Director Rydingsword corroborated her, declaring his opinion that more than 90 percent of emergency assistance recipients were either "[1] eligible applicants or pre-applicants for [GA], who will qualify for Immediate Need benefits, [2] persons entitled to state or federal categorical aid allowances which exceeded maximum [GA] allowances, or [3] persons who declined to apply for or to maintain [GA] eligibility." Those declarations were completely undisputed.

Also undisputed was that the shelter programs were temporary and funded in large part by community donations. It would be odd and precarious to rely on private funding for a program meant to discharge county obligations: odd because it would seem difficult to interest private donors in funding state-mandated programs and precarious because private fundraising would be an unpredicatable way to insure adequate funding. The explicitly short-term scope of the programs further negates any idea of section-17000 intent. Countywide indigent needs cannot be expected to end or fall off abruptly at the end of a fixed time period. Such a program suggests, instead, voluntary aid meant to supplement state-mandated programs. That is the only rational inference to be drawn when those facts are combined with the discretionary, unqualified nature of the aid provided in this case.

Plaintiffs argue that county GA, if stripped of emergency assistance and the Spring Program (and hotline referrals), would fall short of section-17000 obligations toward the homeless. That may or may not be true, but it is not the issue. The only issue before us now is whether the Spring Program and emergency assistance aid must be preserved pending this litigation. If

the proposed new Immediate Need component of GA is inadequate in serving homeless indigents, the issue will no doubt be adjudicated through an appropriate challenge. Defendants do not contest that portion of the *Scates* order which enjoins implementing the Immediate Need Program pending a *Boehm* study, and county counsel candidly conceded below that, unless the county is allowed to implement the Immediate Need Program *as part of GA*, county GA might be deficient in serving the needs of the homeless.[10]

The approach taken by plaintiffs and the trial court in this case misconceives the remedy for an inadequate section-17000 program. The proper remedy is to determine deficiencies and order the county to correct them— not to search out and freeze all county programs which objectively appear to benefit indigents. Plaintiffs' approach would have a court examine a particular non-GA program, see whether it in fact promotes the care-and-aid goals of section 17000, on that basis declare it a section-17000 program and, accordingly, lock it in subject to a *Boehm* study. Such an approach asks a trial court to improperly usurp the functions of the board. (7a) Sections 17000 and 17001 vest power in the board to provide indigent care and aid and to adopt standards to that end. These are legislative functions. Court review is normally limited to determining whether a sufficient factual basis appears to support the board's actions. (*Poverty Resistance Center* v. *Hart, supra,* 213 Cal.App.3d 295, 303-305.)

Plaintiffs' approach would have the *court* declare section-17000 programs, without statutory authority and without the standards and criteria envisioned by section 17001. They cite no authority or precedent for such interference except to invoke the court's "equitable powers." We are not convinced. The "inequity" they claim is a county GA program which might not adequately provide for the homeless. As already noted, however, the remedy for that is to have the court declare the program or any predicate studies inadequate and refer the matter to the board for corrective action. Plaintiffs conceded at oral argument that they could have sought that remedy here, but they argue that the threatened immediate loss of existing homeless programs justified court intervention without waiting for

---

[10] Counsel wrote (italics ours): "Pending implementation of the Immediate Need and Shelter Program and elimination of the Emergency Assistance Program on September 1, 1989, the Board has extended the Spring Shelter and Homeless Hotline Programs, as non-mandated programs under Government Code section 26227, to August 31, 1989. In this connection, *the defendants recognize that the County's previous General Assistance Program, taken alone, arguably may not adequately meet the aid and shelter needs of some homeless persons entitled to assistance from Contra Costa County under section 17000,* pending implementation of the Immediate Need and Shelter Program."

We were informed by counsel for the county at oral argument that the county has gone ahead and implemented the new Immediate Need Program pending this appeal.

the board to act. Their reasoning is illustrated by the following hypothetical. According to plaintiffs, a court could enjoin the modification or termination of any programs which benefit the homeless, even though they might be (1) privately funded, (2) only *administered* by the county and (3) expressly stated in the creating ordinances *not* to be section-17000 programs. They could be altered, plaintiffs urge, only if the county had other homeless programs in place which fully met minimum subsistence needs as envisioned by section 17000.

The argument is misguided. No degree of inadequacy can justify the judicial *creation* of programs under section 17000. The code sections grant no such power to a court, and case law restricts the judicial role to evaluating the adequacy of *existing* such programs, reserving legislative action for the board (*Poverty Resistance Center* v. *Hart, supra,* 213 Cal.App.3d 295, 303-305). Preserving existing section-17000 programs might be proper in a given case, as would ordering that new programs be created, but creating them is the domain of the board alone. Perceived "inequity" cannot confer legislative power on a court under section 17000.

 Also, plaintiffs' approach, by giving an "objective" view of programs supremacy over legislative intent, knows no bounds. Unrelated ordinances and resolutions incidentally benefitting a variety of indigents in a variety of contexts could become entitlements without warning—a cumulative ratchet of benefits that could only be released by a study showing reduced countywide need. How might a court under that approach react to board action in amending the housing component of a general plan? Would action affecting the location of low-income or rental housing, with evident long-term implications for indigents, be frozen? What about actions affecting campsite uses in undeveloped areas?

Fiscal planning demands that control of aid programs be in the hands of the local governing body, not left to the uncertain fate of judicial construction. Courts must respect, whenever possible, the governing body's subjective intent and, before declaring a program a section-17000 entitlement, have firm evidence of such an intent. Any other rule would lay a trap and inhibit creative, experimental solutions.

In conclusion, there is no evidence reasonably suggesting that the board intended the programs enjoined here to be section-17000 aid.[11] Plaintiffs

---

[11] Our dissenting colleague reaches a contrary result by: (1) raising phantom issues; (2) employing a legal approach that, if implemented, would undermine, rather than assist, a county's ability to address the sad and distressing problem of the homeless; and (3) deciding the wrong case. He finds substantial evidence that the enjoined programs were meant to benefit indigents. Of course they were. However, the legally relevant question is whether the pro-

accuse the county of trying to avoid section 17000 duties to the homeless, but the accusation does not hold up. The county was trying to implement and commit itself to a new, generally funded, homeless-aid component of GA when these injunctions threatened to prevent that program from taking effect. Should the new program prove inadequate (a question not before us on this appeal), the remedy will be to order corrective measures, not to resurrect emergency assistance or the Spring Program. The court abused its discretion in holding that the existing programs were section 17000 programs and that altering them required a *Boehm* study. Accordingly, it erred in finding a probability of success on the merits in those respects and in enjoining the programs' termination or alteration.

DISPOSITION

That part of the order in *Scates* enjoining defendants from "failing to implement" the Spring Program or its equivalent is reversed, as is that part of the order in *Randolph* enjoining the elimination or reduction of emergency assistance aid. Each side shall bear its own costs on appeal.

Peterson, J., concurred.

**KLINE, P. J.,** Dissenting.—By permitting the county to decide for itself whether relief it affords its indigent citizens is mandated by state statute or discretionary, the majority emasculates the safety net constructed by the

---

grams were meant to discharge the section 17000 duties of the county. He charges that asking this question, in this case, allows a county to define its own duties. Wrong! To the contrary, section 17000 defines the duties, and we simply respect the board's exclusive statutory power (§§ 17000-17001) to decide how to discharge them. He sees the enjoined programs as needed to discharge section 17000 duties. The record indicates no such issue, or finding, in this case. However, even if it did, we would have no power to hijack and hold hostage *non*-section-17000 programs as a remedy. The effect of the dissent would make *every attempt* by a county to assist indigents a 17000 response and, therefore, subject to the *Boehm* study process. This conclusion by the dissent is not a surprise since he finds, unsupported by statute or case law, that every county's provision of shelter for homeless persons must be *presumed* to be a section 17000 response. Our colleague forgets that the counties of California are dual governmental instruments, both as agents of the state (i.e., to respond to the mandate of section 17000), and as units of local government (i.e., in their discretion and according to their ability, to go beyond the section 17000 minimum subsistence needs of the indigent). A section-17000 response is required and, if felt inadequate, may be challenged in the courts. Counsel for respondents admitted at oral argument that such a challenge was not pursued below. Upon respondents' motion, the trial court acted only to enjoin the reduction or termination of the Spring Program or emergency assistance programs without a *Boehm* study. It is this relief that is the subject of this appeal. The matter before us is not a challenge to the adequacy of the "minimum subsistence" level of the section 17000 response. Apart from a section-17000 response, a county, as an independent governmental instrument, must be allowed to experiment with creative and innovative solutions to social problems, such as the homeless, which distress each member of this panel. However, our dissenting colleague would cut off this independence and make counties mere ciphers for state social policy.

Legislature to protect the neediest citizens. The majority opinion, which ignores both the record and the law, is destined to cause endless mischief.

As will be seen, I disagree with the majority about two things: First, I believe a county's provision of shelter for homeless persons must be presumed to address the minimum subsistence needs of "indigent persons," as required by Welfare and Institutions Code section 17000.[1] I find it hard to imagine that in providing shelter to people who have none a county may "go beyond the section 17000 minimum subsistence needs of the indigent," as the majority suggests. (Maj. opn., *ante*, p. 1102, fn. 11.) If it is claimed that the provision of shelter was intended for some other, discretionary, purpose, and if this intention matters, the county ought at least be required to disclose its inapparent objective. Much more fundamentally, I also disagree with my colleagues' theory that the county's intention to comply with section 17000 is legally significant; the county's intention is in my view entirely beside the point.

## I.

Cognizant that the delegation of authority to administer general relief to the financially pressed counties creates the danger they will try to evade the mandate imposed on them by the Legislature, California courts "have narrowed the discretionary authority of the counties and set a floor to the meaning of general relief." (Bensinger, *From Public Charity to Public Justice: The Role of the Court in California's General Relief Program* (1988) 21 Loyola L. A. L.Rev. 497, 534; see also, *General Assistance in California* (1984) 12 San Fernando Val. L.Rev. 31, 35).) For example, relying upon the landmark opinion of the California Supreme Court in *Mooney* v. *Pickett* (1971) 4 Cal.3d 669 [94 Cal.Rptr. 279, 483 P.2d 1231], our own court recently emphasized that "there are clear-cut limits to this latitude in administering relief. The counties' discretion ' " 'can be exercised only within fixed boundaries. In administering General Assistance relief the county acts as an agent of the state. [Citation.] . . . [T]he agency's regulations must be consistent, not in conflict with the statute, and reasonably necessary to effectuate its purpose. (Gov. Code, § 11374.)' " ' " (*Whitfield* v. *Board of Supervisors* (1991) 227 Cal.App.3d 451, 456-457 [277 Cal.Rptr. 815], citing *Robbins* v. *Superior Court* (1985) 38 Cal.3d 199, 211 [211 Cal.Rptr. 398, 695 P.2d 695], quoting *Mooney* v. *Pickett, supra,* 4 Cal.3d at p. 679.)

*Boehm* v. *County of Merced* (1985) 163 Cal.App.3d 447 [209 Cal.Rptr. 530] (*Boehm I*), one of the most important judicial decisions enunciating the

---

[1]All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

counties' minimum legal duty under section 17000, holds that in adopting standards of aid and care under section 17001 a county must make a determination of the minimum subsistence needs of its indigent residents, and that a reduction in aid unsupported by a showing that subsistence needs will still be met must be deemed "arbitrary and capricious." (*Id.*, at p. 453.) The need for a factual predicate ought to be most apparent where, as here, the county proposes to reduce homeless shelter, since it is commonly believed that the need for such assistance is now increasing rather than diminishing.[2]

Because the county terminated the homeless programs here in issue without the factual study required by *Boehm,* the trial court enjoined reduction or termination of those programs until the completion of so-called *Boehm* studies showing that such action would not deprive indigent persons of minimum subsistence needs.

The county claims *Boehm* studies are not necessary because when it provided the shelter programs in issue it did not intend to discharge duties imposed by section 17000. In this connection, the county primarily relies on an order adopted by the board of supervisors five weeks after the commencement of this class action, declaring that the homeless shelter programs "have not been adopted by this Board as General Assistance programs under Welfare and Institutions Code sections 17000, et seq." The county in effect claims that, because acts taken in ignorance of a statutory duty cannot be considered evidence of an intention to discharge it, the statute is inapplicable. In support of this curious contention counsel for the county repeatedly told the trial judge that at the time the shelter programs were established, the board of supervisors did not "necessarily" intend to serve the needs of indigent persons under the statute because the board did not understand what it was doing.[3] Since it assertedly did not initially

---

[2] For example, a recent and widely reported study of homelessness in 30 American cities reported that "During the past year requests for emergency shelter increased in the survey cities overall by an average of 24 percent, with four out of five of the cities registering an increase, 10 percent reporting that the number of requests remained the same, and another 10 percent reporting a decline in requests." (U.S. Conf. of Mayors, A Status Report on Hunger and Homelessness in America's Cities: 1990 (Dec. 1990) at p. 2.) The report also states that "Every survey city except one expects overall requests for emergency shelter, and requests by homeless families in particular, to increase during the next year." (*Id.*, at p. 3.) This report is consistent with earlier studies demonstrating the growth of homelessness in this state and nation. (See, e.g., U.S. Conf. of Mayors, The Growth of Hunger, Homelessness and Poverty in America's Cities (1986); Homelessness in America: Hearing Before the House Subcom. on Housing and Community Development, 97th Cong., 2d Sess. (1982) published by G.P.O. 1983.)

[3] After the assistant county counsel told the court that at that time "[t]he Board and the people advising the Board on this subject did not have a clear understanding of what they were doing," the following exchange occurred between the court and the county's attorney:

realize, and will not now acknowledge, that the shelter programs were necessary to satisfy subsistence needs, the county maintains they are "discretionary welfare programs" that can be terminated at will without the benefit of a *Boehm* study.

My colleagues agree with the county, believing that the ultimate issue in this case is whether the board intended the programs involved here to discharge its section 17000 obligations. (Maj. opn., *ante*, p. 1089.) I believe the county's argument is absurd.

The application of a statute imposing a mandatory duty cannot be made to depend upon whether the party upon whom the duty devolves intended its application; particularly in a case such as this, in which the putative intention is first disclosed in a self-serving after-the-fact resolution adopted in response to a lawsuit seeking to enforce the statute in issue. The question whether the county intended to be bound by section 17000 is no more than a red herring designed to obscure the real issue in this case: whether the shelter programs are necessary to meet the minimum subsistence needs of indigent persons in Contra Costa County, a question that can only be answered on the basis of adequate *Boehm* studies.

The trial court's finding that the shelter programs discharged duties under section 17000 was based on a prodigious amount of evidence, in the form of expert testimony and studies of the housing needs of indigent persons in Contra Costa County, that the shelter programs were essential to enable indigent county residents to maintain minimum subsistence levels. Numerous experts stated that other forms of housing assistance provided by the county were "woefully and tragically insufficient to meet the needs of the homeless in the county." The experts explained at considerable length

---

"THE COURT: Well, I think you're suggesting that the board may not have been as acutely aware as it may now be . . . , as to the legal consequences of its actions, but is that to say that the Board did not intend when it set up this program to relieve and support incompetent and poor and indigent people?

"MR. WALENTA: The Board did not necessarily intend that.

"THE COURT: What did the Board intend to do other than relieve and support incompetent, poor and indigent persons?

"MR. WALENTA: The Board intended to take people out of the streets and put them into the armories without regard to their status, their eligibility or their circumstances.

"THE COURT: But wasn't it for the purpose of relieving and supporting poor indigent people?

"MR. WALENTA: Not necessarily. That's my whole point. Part of the purpose was simply to get people off the streets.

"THE COURT: So if someone would have asked the Board at the time this program was set up, Mr. or Ms. Board, you don't intend to relieve and support indigent people, do you? They would have said No.

"MR. WALENTA: I don't know what they would have said. . . . They do not have a clear understanding of what they are doing."

how, as stated by University of California Professor Allan Heskin, "by failing to conduct a market survey to determine the availability of housing for those without housing or who lack family or friends from whom to rent, the County has arrived at an artificially low figure [for General Assistance payments] which does not reflect the minimal cost of obtaining shelter in Contra Costa County." The court also relied on the words of the board resolution establishing the shelter programs (No. 88/576), which expressly referred to section 17000, as did every other board resolution arguably relevant to this case.

The majority's conclusion that the record provides insufficient support for a finding that the shelter programs constitute (or were intended to constitute) section 17000 aid (maj. opn., *ante*, at p. 1099) ignores not only the record but the rules governing appellate review of the sufficiency of evidence to support a judgment: "[I]n examining the sufficiency of the evidence to support a questioned finding, an appellate court must accept as true all evidence tending to establish the correctness of the finding as made, taking into account, as well, all inferences which might reasonably have been thought by the trial court to lead to the same conclusion. Every substantial conflict in the testimony is, under the rule which has always prevailed in this court, to be resolved in favor of the finding." (*Bancroft-Whitney Co.* v. *McHugh* (1913) 166 Cal. 140, 142 [134 P. 1157].) Instead of indulging all intendments and reasonable inferences supporting the findings below, which are abundant and compelling, the majority has scoured the record—in vain, in my view—for a scintilla of evidence inconsistent with the findings.

Brushing aside compelling direct and indirect evidence that the homeless shelters in question provided the relief for indigent persons required by section 17000, and indeed were intended to satisfy that requirement, the majority assigns extraordinary weight to "[u]ndisputed evidence" that "some *nonresidents* and even *nonindigents*" used the armories for shelter. (Maj. opn., *ante*, at p. 1100, italics in original.) The evidence the majority seizes upon is a two-page declaration of a "program analyst" for the county social services department who states that "[s]ome of the homeless persons who were provided shelter . . . were not indigent persons [and] some were not Contra Costa County residents." This "evidence" is incompetent.

First of all, since the declarant admits that "[h]omeless persons who were furnished shelter in the Armories and/or housing through the hotline were not screened for eligibility," it does not appear how she could know whether users were indigent or residents of the county. Furthermore, the declaration does not indicate whether "some" persons is three or thirty persons or any

other number; nor does it suggest such individuals collectively constituted a significant percentage of the total number who used the shelters.

The county's claim that the shelters were used by nonresidents is not only factually unsupported but theoretically untenable. It would be a nonsensical and unfair *Catch-22* to restrict homeless benefits to those who can prove they have a local residence—and therefore do not need relief. (Coates, *Legal Rights of Homeless Americans* (1990) 24 U.S.F. L.Rev. 297, 315.) In any case, the county's admission that it did not screen those who used the shelter, as it could have, bars it from belatedly raising this issue (see *Adkins* v. *Leach* (1971) 17 Cal.App.3d 771, 778 [95 Cal.Rptr. 61]), as does the county's failure to claim that imposition of a residency requirement on persons who utilize county homeless shelters would further any governmental interest necessary to effectuate the purposes of the general relief statutes. (See *Nelson* v. *Board of Supervisors* (1987) 190 Cal.App.3d 25, 31 [235 Cal.Rptr. 305].)

In short, the unsubstantiated claim that "some" unidentified number of persons using the homeless shelters were nonindigent or nonresidents provides a grossly inadequate basis for rejecting the considered and eminently sensible determination of the trial court that the shelters benefitted indigent persons legally entitled to such relief under section 17000. The court's determination is based on numerous declarations of persons who state that they are destitute and homeless residents of Contra Costa County who depend upon emergency assistance for shelter and to meet their basic needs as well as upon expert opinions and studies indicating that termination of the benefits in question would deprive numerous poor county residents of minimum subsistence. This evidence is more than enough to support the trial court's findings that the shelter programs cannot be terminated without *Boehm* studies showing that subsistence needs will nevertheless be satisfied.

Rejecting the trial court's conclusion that emergency assistance was a component of county GA, the majority takes the court to task for failing to defer to the county's administrative interpretation of its own regulations. Claiming that "the county had always treated emergency assistance as discretionary and supplemental to GA" (maj. opn., *ante,* at p. 1096) my colleagues declare that "[a] court must accord great weight to an interpretation placed on a board enactment by the administrative agency charged with its enforcement and interpretation, especially where that interpretation is of long standing and has remained uniform. [Citations.]" (Maj. opn., *ante,* at p. 1097.) This reasoning is based on a false premise. The question in this case is not whether the county has complied with a board enactment but whether it is in violation of a *state statute.* No principle of law permits,

let alone obliges, a court to defer to the judgment of a local administrative agency as to whether its regulations or practices comply with the statute it is alleged to have violated. (See *Poverty Resistance Center* v. *Hart* (1989) 213 Cal.App.3d 295, 302-304 [261 Cal.Rptr. 545].) The novel principle relied upon by the majority invites counties to define their general assistance responsibilities as they see fit and in this manner avoid a legislative mandate they may find unpalatable. This cannot be.

The disingenuousness of the county's argument that section 17000 is inapplicable because it did not intend to confer benefits under that statute is revealed by the county's belated reliance on Government Code section 26227. This statute simply authorizes (but does not require) a county board of supervisors to make certain types of appropriations and other arrangements in connection with a vast array of social service programs. Thus, for example, a board "may contract with other public agencies or private agencies or individuals to operate such programs" and "may make available to a public agency, nonprofit corporation, or nonprofit association any real property of the county . . . to carry out such programs . . . without complying with any other provisions of [the Government Code] relating to . . . leasing or granting the use of county property."[4]

The county's extraordinary claim that it provided welfare benefits "pursuant" to this statute, thereby relieving itself of obligations under section 17000, was, first of all, contradicted by county counsel's admission to the trial court that the board "[did] not have a clear understanding of what they were doing" at the time the shelter programs were established. (See fn. 3, *ante.*)

More importantly, the very idea that a county can avoid the mandatory duty imposed by section 17000 simply by choosing instead to provide wel-

---

[4] At the time of the proceedings below, Government Code section 26227 provided in its entirety as follows:

"The board of supervisors of any county may appropriate and expend money from the general fund of the county to establish county programs or to fund other programs deemed by the board of supervisors to be necessary to meet the social needs of the population of the county, including but not limited to, the areas of health, law enforcement, public safety, rehabilitation, welfare, education and legal services, and the needs of physically, mentally and financially handicapped persons and aged persons.

"The board of supervisors may contract with other public agencies or private agencies or individuals to operate such programs which the board of supervisors determines will serve public purposes. In the furtherance of any such program, the board of supervisors may make available to a public agency, nonprofit corporation, or nonprofit association any real property of the county which is not, and during the period of possession, will not be needed for county purposes, to be used to carry out such programs, upon terms and conditions determined by the board of supervisors to be in the best interests of the county and the general public, without complying with any other provision of this code relating to leasing or granting the use of county property."

fare benefits "pursuant" to Government Code section 26227, thereby rendering the "duty" discretionary, is absurd. Given the choice between a mandatory duty and a discretionary power what county would accept the duty? Section 17000, which provides the safety net for our poorest and most vulnerable citizens, would become a dead letter, as would scores of appellate opinions requiring counties to meet the minimum subsistence needs of its indigents without regard to fiscal or other political considerations.

The assumption that the shelter programs were not "a section 17000 response," and that therefore the question of minimum subsistence is not at issue, leads the majority to the conclusion that the present lawsuit is not "a challenge to the adequacy of the 'minimum subsistence' level of the [county's] section 17000 response." (Maj. opn., *ante*, at p. 1103, fn. 11.) According to the majority, if respondents believe their needs are not being met, they should file another lawsuit challenging the adequacy of county assistance that was intended to respond to subsistence needs pursuant to section 17000. (*Ibid.*) This captious reasoning, which would relieve the county of the need to justify a reduction in welfare assistance *before* it could affect the rights of indigent persons, subjects destitute people to additional burdens and risks, repudiates the rule established in *Boehm I, supra*, 163 Cal.App.3d 447, 452-453 and ignores the intention of the Legislature that "provisions of law relating to a public assistance program shall be fairly and equitably construed to effect the stated objects and purposes of the program." (§ 11000.)

## II.

One of the most disturbing aspects of the majority opinion is the policy rationale used to permit the county to reduce benefits without first demonstrating that minimum subsistence needs would still be met. The majority emphasizes that "limited county resources," and the "variable scope of the homeless problem" make "innovation and flexibility vital." It is claimed that if "evolving solutions" to the problem of homelessness are "cast in concrete as enforceable entitlements" counties will not respond, "to the detriment of those who enjoyed and now seek to lock in those programs under section 17000." (Maj. opn., *ante*, p. 1099.) According to my colleagues, "[f]iscal planning demands that control of [these welfare] programs be in the hands of the local governing body, not left to the uncertain fate of judicial construction. Courts must respect, whenever possible, the governing body's subjective intent and, before declaring a program a section 17000 entitlement, have affirmative evidence of such an intent. Any other rule would lay a trap and inhibit creative, experimental solutions." (Maj. opn., *ante*, p. 1102.)

The foregoing statements, which are at the heart of the majority opinion, effectively repudiate *Mooney* v. *Pickett, supra,* 4 Cal.3d 669 and its progeny and misconceive the role of courts called upon to enforce section 17000.

The court declared in *Mooney* v. *Pickett, supra,* 4 Cal.3d 669: "We are aware of the financial difficulties which attend present welfare programs on local, state, and national levels. This court, however, is not fitted to write a new welfare law for the State of California, and while the Legislature addresses itself to that task it remains our task to enforce the existing law." (*Id.,* at p. 680.) Five years later our own division made it crystal clear that, because it deals with minimum subsistence, a county's duty under section 17000 cannot be compromised by any administrative or even fiscal reason. Writing for a unanimous court, Justice Kane declared that "[i]t is clear that section 17000 imposes upon the City and County of San Francisco a mandatory duty to relieve and support its indigents, *and the excuse that it cannot afford to do so is unavailing.* [Citations.]" (*City and County of San Francisco* v. *Superior Court* (1976) 57 Cal.App.3d 44, 47 [128 Cal.Rptr. 712], italics added; accord, *Robbins* v. *Superior Court, supra,* 38 Cal.3d 199, 217; *Nelson* v. *Board of Supervisors, supra,* 190 Cal.App.3d 25, 32; *Clay* v. *Tryk* (1986) 177 Cal.App.3d 119, 125 [222 Cal.Rptr. 729]; *Boehm* v. *Superior Court* (1986) 178 Cal.App.3d 494, 503 [223 Cal.Rptr. 716] (*Boehm II*); *Boehm I, supra,* 163 Cal.App.3d 447, 451; *Rogers* v. *Detrich* (1976) 58 Cal.App.3d 90, 103 [128 Cal.Rptr. 261].) Our court was influenced by the fact that in a series of cases the California Supreme Court "considered the plight of the taxpayers, but in each case concluded that their burdens were not so grievous as to permit indigents, in the midst of plenty, to go hungry, cold and naked without fault." (*City and County of San Francisco* v. *Superior Court, supra,* 57 Cal.App.3d at p. 47.)

Relying on our opinion in *City and County of San Francisco,* the court in *Boehm II* stated that while "[t]his court is not unmindful of the fiscal restraints imposed by Proposition 13 and the consequent need for strict control of all county expenditures . . . , budgetary constraints cannot justify excluding from minimum subsistence grants to the indigent allowance for each of the basic necessities of life . . . ." (178 Cal.App.3d at p. 503; accord, *Bernhardt* v. *Board of Supervisors* (1976) 58 Cal.App.3d 806, 811 [130 Cal.Rptr. 189].) The courts that have strictly enforced section 17000 have not been blind to the economic hardships being experienced by many counties. One such court pointedly acknowledged that "police, fire, and other services are curtailed; libraries close. Counties must find a way to provide many essential services while having only limited means of raising revenues with which to pay for them. For whatever reason, the Legislature has seen fit to place a large portion of the burden of caring for the indigent upon those units of government—the counties—least able to generate necessary

revenues." (*Cooke* v. *Superior Court* (1989) 213 Cal.App.3d 401, 413 [261 Cal.Rptr. 706], fn. omitted.) The court also recognized, however, that "*these practical concerns cannot permit [the courts] to disregard the statutory command [of § 17000] . . . .*" (*Ibid.*, italics added; see also, *Board of Supervisors* v. *McMahon* (1990) 219 Cal.App.3d 286 [268 Cal.Rptr. 219].) Thus, the cost factors that at least contributed to Contra Costa County's termination of shelter programs[5] cannot justify that action.

If a county cannot avoid the mandatory duty imposed by section 17000 *even if it lacks the funds,* all the less can it be permitted to do so in the interest merely of administrative or fiscal "flexibility," as the majority would have it.

The majority's statement that "[f]iscal planning demands that control of aid programs be in the hands of the local governing body, *not left to the uncertain fate of judicial construction*" (maj. opn., *ante,* at p. 1102, italics added) also cannot be squared with the case law. It is established that, while the act of adopting welfare standards "has budgetary consequences, that fact does not make the enactment a part of the budget process. [Citations.]" (*Poverty Resistance Center* v. *Hart, supra,* 213 Cal.App.3d 295, 303.) Because the county's duty to relieve and support the poor is mandated by state law, "the county is subject to the judicial remedy of contempt to compel compliance with its statutory obligations *despite a claim that 'no county funds are available.'*" (*Ibid.*, italics added.) Judicial intervention, far from being a cause for uncertainty, is recognized as the only way to insure that minimum subsistence needs are met. As the county virtually conceded at oral argument before us, its contention that the orders below "exceed the lawful authority of the courts" cannot be squared with the recent opinion in *Poverty Resistance Center* v. *Hart, supra,* which emphatically rejected the view that the factual predicate for supervisorial adoption of discretionary standards of aid and care is immune from judicial review because it consists of the ordinary exercise of the legislative authority to appropriate money. (213 Cal.App.3d at p. 303.) The majority contends that prohibiting termination of an existing county welfare program due to the absence of a *Boehm* study—which involves a finding that the program serves needs required to be met under section 17000—amounts to the impermissible judicial "*creation*" of a welfare program and the usurpation of a county legislative function. (Maj. opn., *ante,* at p. 1102, italics in original.) This conclusion is predicated on an unprecedentedly crabbed view of the role of California courts, which my colleagues believe must defer to the *factually unsubstanti-*

---

[5] When asked at deposition whether cost was a factor in the county's decision to eliminate emergency assistance, the director of the county department of social services allowed that "cost is always a consideration."

*ated* determination of the counties as to whether the benefits they afford indigent persons are required to be provided by section 17000. It is by constricting the role of the judiciary in this manner that the majority effectively converts a mandatory duty into a discretionary power and thereby eviscerates section 17000.

The case law interpreting and applying section 17000, like the mandatory wording of the statute itself, reflects an awareness that general relief programs are "susceptible to political pressures . . . . [and] general relief recipients have no political influence. General relief recipients are the poorest of the poor; they are the homeless and helpless. They are the least likely of any in society to assert their rights because they are the least likely to know them. . . . [¶] But the right to general relief . . . is their only source of aid. Without it, they would have no access to shelter and no source of food. They would be completely destitute. By placing the right to general relief in the hands of the board of supervisors, there is the risk that a minority, those who have the least both financially and politically, will be homeless and hungry due to the political pressures for limited county funds." (Bensinger, *From Public Charity to Social Justice: The Role of the Court in California's General Relief Program, supra,* 21 Loyola L.A. L.Rev. 497, 506-507, fns. omitted; see *Clark* v. *Community for Creative Non-Violence* (1983) 468 U.S. 288, 304, fn. 4 [82 L.Ed.2d 221, 233, 104 S.Ct. 3065], dis. opn. of Marshall, J. ["The homeless are politically powerless"]; Coates, *Legal Rights of Homeless Americans, supra,* 24 U.S.F. L.Rev. at p. 301 [Because "homeless people . . . have no market power and no voting power . . . . [¶] Local elected officials tend to short change aid to the Homeless, so that resources can go to more politically productive areas"]; Hombs, *Social Recognition of the Homeless: Policies of Indifference* (1987) 31 Wash. U.J. Urb. & Contemp. L. 143; Note, *Building a House of Legal Rights: A Plea for the Homeless* (1985) 59 St. John's L. Rev 530, 531-532; Note, *Establishing a Right to Shelter for the Homeless* (1984) 50 Brooklyn L. Rev. 939, 940, fn. 8.)

The requirement that a reduction in county welfare benefits be accompanied by a *Boehm* study is predicated on the reasonable judicial assumption that such benefits would not originally have been provided if responsible county officials had not determined they were needed to maintain minimum subsistence. A factual showing that such need no longer exists or has diminished or has been met in some other fashion demonstrates that the county is not sacrificing the subsistence needs of indigent persons in order to satisfy other demands and provides the courts, which are ultimately responsible for enforcing section 17000, a rational basis upon which to determine whether a county has violated the mandatory duty imposed by that statute.

In short, welfare benefits a county has already put in place to meet the needs of its poorest citizens *are* "cast in concrete," to use the majority's term, and cannot be reduced, if the county refuses or is unable to show that the proposed reduction would not deprive the county's indigent residents of minimum subsistence needs. (*Boehm I, supra,* 163 Cal.App.3d at p. 452.) Because such a *Boehm* study is essential "to satisfy the statutory mandate that the county relieve and support its indigents" (*ibid.*), any reduction that is not justified in this manner must be deemed arbitrary and capricious.

Contra Costa County, which appears to have acted on the basis of fiscal considerations (see fn. 5, *ante*), never even attempted to demonstrate that termination of the shelter programs would not impair rights of indigent persons under section 17000. Accordingly, I would affirm the judgment.

A petition for a rehearing was denied May 31, 1991.